IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 6, 2001 Session

## ARTHUR BLAIR v. MARILYN BADENHOPE

**Appeal from the Court of Appeals, Eastern Section**
**Chancery Court for Greene County**
**No. 93-101    Thomas R. Frierson II, Chancellor**

---

**No. E1999-02748-SC-R11-CV - Filed May 3, 2002**

---

ADOLPHO A. BIRCH, JR., dissenting.

With today's holding, the majority declares, essentially, that a parent who voluntarily surrenders custody of a child forfeits any right to custody and from that day forward is shorn of parental status and relegated to a status no better than that of a non-parent, should the parent petition to modify the custody decree. I cannot agree. In my view, this decision condescendingly brushes aside the fundamental and constitutionally-grounded principle that a parent has a right to raise a child without undue governmental interference. Likewise, the holding disregards the presumption, widely recognized in law, that a child's best interests are served most effectively, where possible, by placement with a fit parent. The majority's holding places far too little weight on the parent's fitness to care for the child or the parent's efforts, no matter how extensive or admirable, to foster and nurture a loving bond with the child. Moreover, my views aside, the majority misapplies its own analysis to reach a result I find to be unsupportable and unjust. For these reasons, I respectfully dissent.

### I. Parental Rights in Custody Cases

At the heart of this case, in my view, is the principle that government should not unduly interfere with the decisions of fit parents in the upbringing and care of their children. The United States Supreme Court has recognized this right as part of the constitutional liberty interest guaranteed by the Fourteenth Amendment. See Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S. Ct. 571, 573-74, 69 L. Ed. 1070 (1925) (holding that the government may not "unreasonably interfere[] with the liberty of parents . . . to direct the upbringing and education of [their] children"); see also Prince v. Massachusetts, 321 U.S. 158, 166, 64 S. Ct. 438, 442, 88 L. Ed. 645 (1944) (recognizing a "private realm of family life which the state cannot enter"). Perhaps more important here, this Court has recognized that Article I, Section 8 of the Tennessee Constitution "fully protects the right of parents to care for their children without unwarranted state intervention." Hawk v. Hawk, 855 S.W.2d 573, 579 (Tenn. 1993). Assuredly, the parental right is not unlimited, for a parent must create a "linkage between parental duty and parental right" by taking steps to establish a parental relationship with the child. See Lehr v. Robertson, 463 U.S. 248, 257-58, 103 S. Ct. 2985, 2991, 77

L. Ed. 2d 614 (1983); Petrosky v. Keene, 898 S.W.2d 726, 728 (Tenn. 1995). Where a parent has invoked constitutional protections by making efforts to create such a relationship, however, the parental right is of considerable weight, and we should not abandon it lightly.

This Court described the magnitude of the parental right over 80 years ago in In re Knott:

> The relations which exist between the parent and child are sacred ones and have their foundation in nature, and the affection existing between them is stronger and more potent, and affords a greater protection to the child, than any relation which could be created by association merely. The right to the society of the child exists in its parents; the right to rear it, to its custody, to its tutorage, the shaping of its destiny, and all of the consequences that naturally follow from the relationship are inherently in the natural parents, and they cannot be deprived of these rights without notice, and upon some ground which affects materially the future of the child.

197 S.W. 1097, 1098 (Tenn. 1917). Because of this fundamental right, guaranteed by the Tennessee Constitution and by the United States Constitution, the courts of Tennessee should not superimpose their will over that of a fit parent in child custody disputes with a non-parent, without compelling justification.

In my view, when considering a dispute between a parent and a non-parent, the parental right should be deemed paramount. As this Court held in In re Adoption of Female Child:

> [I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

896 S.W.2d 546, 548 (Tenn. 1995). Thus, the parent should prevail unless the child would face a danger of substantial harm if placed in the parent's custody.

The majority suggests that this "superior parental right" analysis is inconsistent with, and in this case should be rejected in favor of, an examination of the "best interests of the child." Such an assertion is flawed, however, because it fails to acknowledge the widely-accepted "presumption that fit parents act in the best interests of their children." Troxel v. Granville, 530 U.S. 57, 68, 120 S. Ct. 2054, 2061, 147 L. Ed. 2d 49 (2000). As the United States Supreme Court succinctly stated in Parham v. J.R.:

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for

-2-

judgment required for making life's difficult decisions. More important, <u>historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children</u>.

442 U.S. 584, 602, 99 S. Ct. 2493, 2504, 61 L. Ed. 2d 101 (1979) (emphasis added); <u>see also</u> <u>Busa v. Busa</u>, 589 A.2d 370, 371 (Conn. App. 1991) (discussing Conn. Gen. Stat. Ann. § 46b-56b, which recognizes "a presumption, in custody disputes between a parent and a nonparent, that it is in the best interest of the child to be in the custody of the parent").

Legal scholars too have asserted that placement with a fit parent is in the child's best interest in many instances. <u>See, e.g.</u>, Carolyn Wilkes Kaas, <u>Breaking Up a Family or Putting It Back Together Again: Refining the Preference in Favor of the Parent in Third-Party Custody Cases</u>, 37 Wm. and Mary L. Rev. 1045, 1097, 1130 (1996) (recommending that a legal "preference" be given to a parent seeking to regain custody from a non-parent, even when "the child's parent . . . voluntarily placed the child with the nonparent, or consented to such placement"). Indeed, even some proponents of granting "psychological parents" rights equivalent to those enjoyed by "biological parents" recognize that where "the parents have maintained contact with the child, or the child has retained strong emotional ties to the biological parents, return to the biological parents is generally best." <u>See</u> Carolyn Curtis, <u>The Psychological Parent Doctrine in Custody Disputes Between Foster Parents and Biological Parents</u>, 16 Colum. J.L. & Soc. Probs. 149, 169 (1980).

The majority posits that the constitutional right of parents, however fundamental, inviolable, and well-established in law it may be, should be extinguished in cases where the parent has voluntarily relinquished custody or a valid court order has placed custody with a non-parent. The majority opinion suggests, in such cases, that the parent and non-parent essentially stand on equal footing, so that whatever custody arrangement is perceived by the courts as best serving the interests of the child should prevail. Superimposed upon that best-interest analysis is the requirement that the parent prove that there has been a substantial and material change in circumstances since the court order.

I firmly believe, however, that the position espoused by the majority ignores the bedrock principle that the biological and emotional connection between a fit parent and a child bestows upon each the right to live as a family undisturbed by and immune from the interference of courts and well-meaning relatives. Only in cases where the otherwise fit parent has failed to "develop a responsible relationship with the child"[1] should the analysis proposed by the majority be considered, for only in those cases may the parental right truly be deemed relinquished. Where a parental relationship has been established and nurtured, however, the law should recognize the liberty interests of both parent and child to live together, where possible, as a family.[2] In short, I would

---

[1]<u>See</u> <u>Petrosky</u>, 898 S.W.2d at 728.

[2]Indeed, in at least some of the cases cited by the majority, the facts show that the parent failed to foster the
(continued...)

adhere to the principle that a child is, presumptively, better placed with a fit parent than with a "fitter" non-parent. Only the danger of substantial harm to the child justifies intrusion into the almost sacred and assuredly constitutionally protected relationship of parent and child.

Besides, the majority's decision to deny superior rights to a parent who voluntarily surrenders custody to a non-parent will forever penalize parents whose decision to surrender custody was made with the best interests of the child as the paramount factor. For example, in many cases, a parent may relinquish legal custody because of severely acute financial problems. In others, a parent may be too immature to bear the responsibility of caring for a child. In some cases, such as the one under submission, the parent's relationship may be such that the parent decides, at least initially, that it would be better for the child to live with the non-parent. In all of these cases, however, the parent may continue to make extraordinary efforts to cultivate and strengthen the pre-existing loving bond with the child. Also, by supporting the child financially or emotionally, or both, the parent may nurture the natural expectation of reunification with the child once circumstances change.

Sound policy considerations dictate that such choices should be encouraged–not curtailed. As one commentator writes,

> A preference approach tells the parents that they get a second chance. Hopefully, this standard will encourage parents with problems to seek help and strive to rehabilitate themselves. The preference should also reassure a parent that he need not fear placing his child with a good and loving caretaker. If a parent believes that he has no chance to compete with the caretaker under the best interests approach, he may be less apt to agree voluntarily to recognize his problems and settle his child with someone capable and familiar to the child. Alternatively, if the court removes the child, the parent who faces an unfavorable comparison with the caretaker may be inclined to give up any hope of reunification and lose the drive to keep up contact with his child.

Kaas, supra, at 1097. The majority's holding converts sincere efforts by well-meaning parents into forfeitures. What they are forced in this context to forfeit is the constitutional protection accorded to their status as parents. It may well be that the majority's decision ultimately will undermine the best interests of children in Tennessee, for parents now will be deterred from making choices that otherwise would benefit the child.

---

[2](...continued)

protected status of a natural parent. See, e.g., C.R.B. v. C.C., 959 P.2d 375 (Alaska 1998) (custody denied, but visitation granted, where father was merely beginning to rebuild a relationship with his sons "after three nearly incommunicado years"); Ex Parte McLendon, 455 So.2d 863, 865 (Ala. 1984) (custody awarded to grandparents where the mother had left the child in the care of the grandparents and had only visited infrequently over most of the child's life).

Another untoward consequence of the majority's holding is that parents in many cases may make custodial decisions without fully understanding the legal ramifications of their choice. I find it troubling that a parent who intends to further the interests of the child may lose important constitutional rights in that effort. Courts must affirmatively exercise their obligation to ensure that the parent understands the legal effect of the transfer of custody. Such a "trap for the unwary" should never confront a Tennessee citizen.

In order to give full voice to the constitutional rights of parents, and in order to fully recognize that the best interests of the child are most effectively served by placement with a fit parent, I would hold that a child should be returned to the parent's custody when that parent demonstrates that the child will not be substantially harmed as a result. This would be more consistent with the "substantial harm" standard we have applied in initial custody determinations between a parent and non-parent. See In re Askew, 993 S.W.2d 1, 4 (Tenn. 1999) ("The magnitude of a parent's constitutional right to rear and have custody of his or her children . . . [necessitates] a clear finding of substantial harm."). Notably, the burden of proof shifts to the parent in subsequent petitions to modify custody because of res judicata principles[3] and because, after a child has been removed from the parent's custody, it is reasonable to obligate the parent to prove that the reason for the initial removal no longer exists. Beyond this burden shifting, however, I see no justification why the constitutionally protected rights of a parent, which we hold so fundamental in initial custody determinations, should be deemed to evaporate whenever there is a prior order granting custody to a non-parent. Cf. Stubblefield v. State ex rel. Fjelstad, 106 S.W.2d 558, 587 (Tenn. 1937) ("The court cannot lightly, and without good cause, invade the natural right of the parent to the custody, care, and control of his . . . child.").

As the majority correctly notes, it is well-established that "parental rights are superior to the rights of others and continue without interruption unless a biological parent consents to relinquish them, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child." O'Daniel v. Messier, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). None of the factors which might "interrupt" the superior parental right, however, are present in the case under submission. Blair has not conducted himself in a manner which would substantially harm Joy, nor has he abandoned her.[4] And despite the majority's assertions, Blair's initial agreement that Badenhope should have custody of Joy does not constitute an agreement to forfeit his parental rights. Had Blair agreed to terminate his parental rights, as might have been done, such a forfeiture would occur, but the agreement here, that Blair would enjoy generous visitation while surrendering custody to Badenhope, indicates a genuine desire not to terminate parental rights. The majority's decision

---

[3]Courts in other jurisdictions have expressed the fear that placing the burden upon the custodial non-parent in a petition to modify a prior custody decree would compromise the finality of the initial custody decree. See, e.g., Darlene S. v. Justino L., 533 N.Y.S.2d 179, 182 (N.Y. Fam. Ct. 1988). This problem is avoided, however, where the burden of proof is placed upon the party petitioning to modify the decree.

[4]One legal commentator writes, "Not every voluntary placement with a nonparent is an abandonment. If the parent has remained in contact with the child and contributed financially to her support, no court would find such a situation to constitute abandonment." Kaas, supra, at 1069 n.99 (emphasis added).

to disregard Blair's rights as a parent is an unwarranted revision of our prior law. Accordingly, in my view, the best interests standard applied by the majority is not the proper analysis.

## II. Application to the Case Under Submission

The standard I propose, which restores custody to a parent where the parent demonstrates that the child would not be substantially harmed as a result, may best be illustrated by application to the facts before the Court.

In the case under submission, custody was initially placed with Badenhope pursuant to an agreed order, and it does not appear that the North Carolina court made any finding that Joy would face substantial harm if custody were awarded to Blair. Indeed, Tennessee trial courts have twice expressly found Blair to be a fit parent. Blair had discovered he was the father of a motherless child–a child with whom he had no relationship at the time–and though he originally agreed to allow custody to remain with the grandmother who had cared for her, he persistently and relentlessly pursued a relationship with the child from that time forward. His efforts included moving to the state and city where the grandmother resided, for the sole purpose of being closer to the child. The testimony reveals that because of these efforts, a loving bond has been created between parent and child. Notably, the trial court did find that Joy would face substantial harm if custody were awarded to Blair. Careful review of the record, however, indicates that the evidence in this regard is not persuasive. There exists in the record absolutely no evidence that Joy would face substantial harm if placed in her father's custody. Under the circumstances, the prior voluntary surrender of custody notwithstanding, there exists no sound policy justification why the law of this state should stand as an obstacle to the uniting of this parent and his child. Far to the contrary, the majority's decision today gives the non-parent a weapon with which to sever forever the natural bonds.

Before a finding of substantial harm is justified, I would hold that a genuine danger of injury to the physical, emotional, or mental well-being of the child must exist. Other states applying similar parental rights analyses have concluded that parents may be deprived of the custody of their children only if "shown to be unfit to perform the duties that custody imposes." 2 Homer H. Clark, Jr., The Law of Domestic Relations in the United States § 20.6 at 529 (2d ed. 1987). These states "generally require[] proof of such serious parental inadequacy as child neglect, child abuse, parental inability to care for the child, or conditions such that the child will suffer severe physical or emotional harm if left in the care of the parent." Id. at 530 (footnotes omitted).

A similar analysis is applicable to Tennessee custody disputes between a parent and non-parent. While the variability of human behavior renders it unwise to specify the evidence which would support a finding of substantial harm, it is clear, in my view, that the requirement cannot be satisfied by proof of harm which is trivial, insignificant, or transitory in its duration or impact. Moreover, the mere notion that harm might occur should be insufficient. The evidence must demonstrate clearly that a danger exists before a finding of substantial harm may be justified. Most important, the residual problems which are inherent in many transitions of custody should not, in ordinary circumstances, constitute a danger of substantial harm. Otherwise, it often would be

impossible for a parent to regain custody from a non-parent, for a child inevitably will face some problems in almost every case involving a change of custody.

In the case under submission, the trial court essentially designated four reasons supporting its finding of substantial harm: (1) a past relationship of some sort between Blair's wife and another man; (2) the stability of Badenhope's home environment; (3) Badenhope's emotional bond with Joy; and (4) Badenhope's willingness to foster a relationship between Joy and Blair.

Addressing the trial court's reasons *seriatim*, as to the relationship between Blair's wife and another man, the evidence was, at best, vague and inconclusive. Even were we to assume that the relationship had been inappropriate, it terminated in 1996, and the man has since left Tennessee. No evidence was presented which suggested that Joy had been affected by the relationship when it was on-going. Nor was any evidence introduced that Joy would be harmed in the future by what appears now to be a matter of history.

Although the trial court opined that Badenhope's home would provide a more stable environment than Blair's home, the stability of Badenhope's home does not directly bear on the substantial harm analysis. The stability of Blair's home is relevant only as it may tend to prove that Joy would face the danger of substantial harm if placed in that environment. No such proof appears in the record.

The trial court used Badenhope's emotional bond with Joy as one of the supports for its finding of substantial harm. The fact that Joy and Badenhope have developed a strong emotional bond is commendable. It does not suggest, however, that Joy will experience substantial mental, emotional, or physical harm from the change of custody.

Finally, Badenhope's willingness to foster a relationship between Joy and Blair is immaterial. Although cited by the trial court as one of the bases for finding substantial harm, this factor would, seemingly, relate to Badenhope's fitness. Such a consideration bears no relevance to the substantial harm analysis.

Having considered the facts in the record, I would conclude that the preponderance of evidence demonstrates clearly that Joy will not face any danger of substantial harm if placed in Blair's custody. Accordingly, I would order Joy to be placed in Blair's custody forthwith.

Moreover, even if I were to accept the standard adopted by the majority, I would continue to disagree with its ultimate conclusion. The majority concludes that Blair has failed to demonstrate a material change in circumstances sufficient to justify a modification of the original custody decree, and consequently it dismisses his petition. I disagree with this conclusion that there has been no material change of circumstances in this case.

When Blair originally agreed to surrender custody of Joy to Badenhope, his relationship with his daughter was uncertain and had only begun. Indeed, he apparently did not even see Joy until after

her mother's death. But in the many years that have passed since that time, Blair has expended great effort to create a strong, loving bond with his daughter. That bond has flourished to such a degree that Joy now has expressed an interest in living with Blair. Additionally, Blair has moved to Tennessee to be nearer to Joy,[5] and he has purchased a new home in a neighborhood where Joy has many friends. Blair's relationship with his daughter, his daughter's interest in living with him, and even his place of residence have changed entirely. The majority, however, holds these dramatic changes for naught. Essentially, the majority holds that a parent's efforts to assume parental responsibilities in an exemplary fashion and improve the relationship with his or her child can never constitute a changed circumstance sufficient to warrant reconsideration of a custody award.

To a layperson, it would be evident that the circumstances of Blair's relationship with his daughter are completely different than they were when the initial custody decree was entered. Our adoption of a legal standard which embraces results so contrary to the expectation of average citizens invites criticism, perhaps well-deserved, that we who apply the law have become estranged from the everyday lives of the people of Tennessee. To embrace such a standard in this case is to lend credence to that charge.

Having concluded that there has been a sufficient material change of circumstances in this case, I next would submit that the "best interest" analysis embraced by the majority should result in Joy being transferred to Blair's custody. A multitude of factors must be weighed in considering a child's best interests, including, *inter alia*, the stability of a family, the emotional ties between parent and child, the disposition of the parent to provide care for the child, the character and behavior of any person who may be living with the parent, the parent's potential for future performance of parenting responsibilities, and the reasonable preference of the child if twelve years of age or older. Tenn. Code Ann. § 36-6-106 (2001). Blair offers a loving, stable home, and the bonds between him and his daughter have increased substantially in the years since Joy's birth. He has demonstrated a commitment to providing for Joy's care, both in the past and in the future. The emotional and psychological benefits of living in such an environment with a biological parent should not be disregarded. Likewise, his wife has displayed a willingness and ability to serve as a worthy caregiver for Joy. Finally, the testimony at trial reflected that Joy has expressed a desire to live with Blair and his wife. I find this choice reasonable and give it significant weight.[6] Overall, I find that the bulk of the statutory factors indicate that it would be in Joy's best interests to be placed in Blair's custody. Consequently, even under the analysis proposed by the majority, I would submit that father and daughter should be united.

## III. Conclusion

---

[5]The record is unclear regarding exactly when Blair moved to Tennessee. Prior published opinions in this matter, however, indicate that the move occurred subsequent to the entry of the North Carolina decree. See Blair v. Badenhope, 940 S.W.2d 575, 576 (Tenn. Ct. App. 1996).

[6]I would note that other jurisdictions also give weight to the reasonable preferences of a child in custody determinations. See, e.g., Sheppard v. Hood, 605 So. 2d 708, 712 (La. Ct. App. 1992); Venable v. Venable, 445 N.E.2d 1125, 1130 (Ohio Ct. App. 1981).

For the foregoing reasons, I cannot agree with the result reached by the majority. At the outset, this Court should, in my view, adopt a standard under which a parent would be able to regain custody of his or her child from a non-parent when the parent is able to demonstrate that the child would not be substantially harmed as a result. Moreover, I would submit that Joy should be placed in Blair's custody even under the "best interests" analysis embraced by the majority. I would reverse the judgment of the Court of Appeals and remand this cause to the trial court for entry of an order transferring custody to Arthur Blair unconditionally. I do not choose to join my colleagues in their hasty retreat from precedent established in In re Knott, 197 S.W. 1097 (Tenn. 1917); Stubblefield v. State ex rel. Fjelstad, 106 S.W.2d 558 (Tenn. 1937); Hawk v. Hawk, 855 S.W.2d 573 (Tenn. 1993); Petrosky v. Keene, 898 S.W.2d 726 (Tenn. 1995); In re Adoption of Female Child, 896 S.W.2d 546 (Tenn. 1995); and In re Askew, 993 S.W.2d 1 (Tenn. 1999). Throughout all of these cases, this Court has vigorously and conscientiously protected the superior right of parents to the custody of their children. That protection is, regrettably, ignored today. I cannot condone a result which I view as artificially constructed in derogation of natural law. Thus, I am compelled to dissent, respectfully.

 

_____
ADOLPHO A. BIRCH, JR., JUSTICE